IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
SEOUL BROADCASTING SYSTEM          )
    INTERNATIONAL, INC., et al.,    )
                                    )
           Plaintiffs,              )
                                    )   1:09cv433 (LMB/IDD)
       v.                           )
                                    )
YOUNG MIN RO, et al.,               )
                                    )
           Defendants.              )
```

MEMORANDUM OPINION

This civil action is a copyright infringement action in which plaintiffs seek legal and equitable remedies for the unauthorized reproduction, rental, and sale of their proprietary television programming by the defendants, in violation of 17 U.S.C. § 101 et seq. The Court has already granted summary judgment of liability for direct, vicarious, and contributory copyright infringement in favor of the plaintiffs, on Counts One, Three, and Four of plaintiffs' Second Amended Complaint, respectively, leaving for a bench trial the issue of damages and other appropriate relief. See Dkt. No. 207 (April 8, 2011 Order granting plaintiffs' Joint Motion for Partial Summary Judgment).[1]

_____

[1] Plaintiffs' Second Amended Complaint also asserted a claim for breach of contract against defendants Ro and Daewoo Video, see Dkt. No. 72 (Pls.' Second Amend. Compl.) ¶¶ 94-99 (Count Two), but plaintiffs orally moved to voluntarily dismiss that claim. By an Order entered June 20, 2011, the Court therefore dismissed Count Two of plaintiffs' Second Amended Complaint with prejudice. See Dkt. No. 234. Furthermore, plaintiffs' Second Amended Complaint named "Does 1 through 10" as additional defendants in this action, but plaintiffs never sought leave of the Court to amend their Complaint to include the true names of those fictitious defendants.

On June 20, 2011, a one-day bench trial was held, during which testimony was provided by seven witnesses, including corporate representatives from each plaintiff, a forensic expert, defendant Sun Yop Yoo, and two employees of defendant Korean Korner, Inc. Defendant Young Min Ro did not personally appear at trial, but was represented by counsel.  Having heard the evidence, the Court makes the following factual findings.

## I.  Findings of Fact

1.  Plaintiffs Seoul Broadcasting System International ("SBSI"), Mun Hwa Broadcasting Corporation ("MBC"), and KBS America, Inc. ("KBSA"), are United States-based affiliates of the three largest television broadcast corporations in South Korea. Each of the plaintiffs derives significant revenue from advertising and from the sale and licensing of DVDs and videotapes of its proprietary programming, and each plaintiff is accordingly authorized to distribute Korean-language television programming to Korean expatriates in the United States through rebroadcasts and through the rental and sale of videotapes and DVDs.  See Dkt. No. 72 (Pls.' Second Amend. Compl.) ¶¶ 5-7, 22-29.

2.  The plaintiffs have established that they are the exclusive owners of valid copyrights in the video programming at issue in this action, and that they hold Certificates of Copyright Registration from the United States Copyright Office for those works, or have applications for such copyright registration

2

currently pending.  See Dkt. Nos. 219 and 220 (Memorandum Opinion
and Order, denying defendants' Motion for Reconsideration of the
Court's summary judgment ruling, and finding that "plaintiffs have
provided sufficient proof of their ownership of the rights to the
works that form the basis for this copyright infringement action");
see also Pls.' Trial Exs. 102-145 and 195 (Certificates of
Registration for approximately 75 relevant episodes of the
plaintiffs' works).

      3.  Corporate defendant Daewoo Video, Inc. ("Daewoo") is a
Virginia corporation that was owned and operated during the
relevant time period of 2008 through 2009 by defendant Young Min Ro
("Ro").  The parties have stipulated that Ro was the sole owner,
officer, and director of Daewoo, and that he had "total control of
all operations of Daewoo Video, Inc."  See Dkt. No. 231
(Stipulation[s] of Fact of the Parties) ¶ 5.  Although now defunct,
Daewoo previously maintained three video stores within this
district, in Annandale, Fairfax, and Falls Church, Virginia, which
did business as "Best Seller Video," "Daweoo Video-S.M.," and
"Hanarum/Daewoo Video," respectively.

      4.  Corporate defendant Korean Korner, Inc. ("Korean Korner")
is a Maryland corporation located in Wheaton, Maryland.  Korean
Korner has been in business for over 30 years as a general store,
part of which has at times included a video rental and/or sales
department.

5.   Defendant Sun Yop Yoo ("Yoo") is the former owner of Ahn Bang Video, another video store that was in the business of renting, selling, and/or distributing Korean language video programming in Fairfax County, Virginia.  Ahn Bang Video is also now defunct.

6.   Each of the defendants previously operated under various oral licensing agreements with each of the plaintiffs, whereby the defendants were authorized to receive "master" versions of the plaintiffs' copyrighted works, and then to rent copies of those works to their walk-in customers, in exchange for paying regular licensing fees to the plaintiffs on a weekly basis.  Those licensing agreements were all terminated at some point in 2008 or 2009, when defendants either stopped paying their licensing fees, refused to take further delivery of or failed to pick up shipments of the plaintiffs' "masters," or were suspected of copyright infringement.[2]

7.   The parties have agreed that the licensing fees charged by the plaintiffs to the various Daewoo video stores were as follows:

---

[2] Specifically, all three Daewoo stores ceased to receive deliveries of KBSA's masters on February 25, 2008, and of MBC's masters on November 30, 2008, thereby leading to the termination of their respective license agreements.  Best Seller Video and Hanaram/Daewoo Video had their agreements with SBSI terminated in March 2008, while Daewoo Video-S.M. had its agreement with SBSI terminated in October 2008.  Korean Korner's licensing arrangements with the plaintiffs were all terminated in or about September or October 2009.  Finally, plaintiffs terminated their licensing arrangements with Yoo, as proprietor of Ahn Bang Video, at some point in the late spring or summer of 2009, after she failed to pick up several weekly deliveries of masters.

a.   The fee charged by KBSA to Daewoo's Annandale, Virginia store (Best Seller Video) as of February 25, 2008 was $200 per week.

b.   The fees charged by KBSA to Daewoo's Fairfax and Falls Church stores (Daewoo Video-S.M. and Hanarum/Daewoo Video, respectively) as of February 25, 2008 were $400 per week.

c.   The fees charged by MBC to each of the three Daewoo stores as of November 30, 2008 were $350 per week.

d.   The fees charged by SBSI to each of the three Daewoo stores as of March 2008 were $315 per week.

See Dkt. No. 231 (Stipulation[s] of Fact of the Parties) ¶¶ 10-14.

8.   Daewoo Video, Inc. has admitted that notwithstanding the termination of its licensing agreements with the plaintiffs between February and November 2008, it continued to rent and sell copies of the plaintiffs' proprietary works through June 30, 2009.  Id. ¶ 15. Such unauthorized rentals and sales were in violation of the plaintiffs' exclusive rights to the works in question.

9.   If Daewoo had paid fees to KBSA from March 2008 through June 30, 2009, it would have paid $71,000.00.  See id. ¶ 16. If Daewoo had paid fees to SBSI from March 2008 through June 30, 2009, it would have paid $54,495.00.  Id. ¶ 17.  Finally, if Daewoo had paid fees to MBC from December 2008 through June 30, 2009, it would have paid $29,400.00.  Id. ¶ 18.  Taken together, therefore, Daewoo should have paid $154,895.00 in licensing fees to the

5

plaintiffs for use of their proprietary television programming from
March 2008 through June 2009.

10.   Ro and Daewoo (collectively, "the Daewoo defendants")
obtained the unauthorized DVDs of the plaintiffs' works that they
distributed from March 2008 through June 2009 in several different
ways.   First, defendants Korean Korner and Yoo sold copies of
"master" DVDs of some of the plaintiffs' proprietary video
programming to the Daewoo defendants, thereby contributing to the
Daewoo defendants' copyright infringement.

Specifically, from March 2008 through June 2009, Daewoo and Ro
purchased 200-250 DVDs of KBSA works per week from Yoo.   From
November 2008 through June 2009, the Daewoo defendants also
purchased 200-250 DVDs per week of SBSI works from Yoo, and 200-250
DVDs of MBC works per week from Korean Korner.   In total, the
Daewoo defendants purchased approximately 24,000 DVDs of the
plaintiffs' works, at an average price of approximately $1.00 per
DVD, from Korean Korner and Yoo during the relevant time period.
Korean Korner made $7,000 in profits from its sales to Daewoo and
Ro, while Yoo and Ahn Bang Video made approximately $17,000 in
profits from sales to the Daewoo defendants.   See Pls.' Trial Exs.
152-53, 163, and 165 (invoices and compilations of sales data,
showing $7,000.00 in gross revenue for Korean Korner's sales to the
Daewoo defendants and $16,951.00 in gross revenue for Yoo's sales
to the Daewoo defendants, for a total of $23,951.00.)

6

11.   Additionally, the evidence also clearly establishes that the Daewoo defendants engaged in unlawful video copying and piracy to obtain the DVDs that they offered for rental and sale from March 2008 through June 2009.  For example, on April 7, 2009, private investigators hired by the plaintiffs visited the three Daewoo stores and purchased 162 DVDs containing video programming belonging to the plaintiffs.  See Pls.' Mot. For Partial Summ. J. at Ex. 38.  Forensic software analysis of those 162 DVDs, performed by Missing Link Security, revealed that 98 of those DVDs, or approximately 60% of the DVDs purchased, had a "WINAVI" volume identifier.  See Dkt. No. 231 (Stipulation[s] of Fact of the Parties) ¶ 3.  Those 98 DVDs encompassed at least 146 unique episodes of the plaintiffs' copyrighted works.  Id.; see also Pls.' Mot. For Partial Summ. J. at Exs. 36-37 (Missing Link Security report and Decl. of Clayton Holland).

A digital forensic investigator and IP security expert from Missing Link Security, Clayton Holland ("Holland"), testified during the bench trial that the "WINAVI" volume identifier is a clear indicator that the DVDs were pirated and that they were created or edited on Windows personal computers, rather than being authorized master copies of the plaintiffs' works.  Furthermore, the 98 infringing DVDs also contained on-screen branding that was not consistent with authorized masters, including the website URL "www.ental.co.kr," which is a website that was previously found by several Korean courts to infringe the plaintiffs' copyrights.  See, e.g., Pls.' Trial Exs. 3-46 (screen captures of the purchased DVDs

containing the "WINAVI" identifier and non-master branding, such as "www.ental.co.kr"); see also Dkt. No. 231 (Stipulation[s] of Fact of the Parties) ¶ 2.

12. Similarly, of the 8,105 DVDs that the Daewoo defendants produced to the plaintiffs during discovery, all but one of those DVDs contained programming belonging to the plaintiffs, and 1,574 DVDs, or approximately 20% of the total production, carried the unauthorized "WINAVI" volume identifier. See id. ¶¶ 1, 3. Those 1,574 DVDs contained approximately 3,300 episodes of the plaintiffs' works, of which 833 were unique episodes. Id. Approximately 90% of the DVDs had the "ental" website URL on the screen, while the remaining 10% had other non-master branding. See Pls.' Mot. For Partial Summ. J. at Exs. 37 (Missing Link Security report); see also Pls.' Trial Exs. 47-101 (screen captures of a representative sample of the produced DVDs containing the "WINAVI" volume identifier and various non-master branding).

13. As this Court previously found in granting summary judgment of copyright infringement to the plaintiffs, there is clear evidence of at least 99 indisputable infringements of plaintiffs' registered copyrighted works. Of the 99 infringements, 37 are for works that were registered within three months of the date of first publication or that were registered before infringement, meaning that plaintiffs are entitled to statutory damages for those 37 works. See 17 U.S.C. §§ 412, 504(c); see also Pls.' Trial Ex. 168 (compilation of 37 known statutory violations

from purchased and produced DVDs).  For the remaining 62 works, which were registered after infringement or within five years of the date of first publication, plaintiffs are entitled to actual damages and disgorgement of profits, if such damages are not already subsumed by the statutory award.  See 17 U.S.C. § 504(b); see also Pls.' Trial Ex. 169 (compilations of known non-statutory violations).

14.   The actual profits that the Daewoo defendants derived from unlawful sales of the plaintiffs' copyrighted works are almost impossible to calculate with any degree of precision because Daewoo and Ro did not maintain, or at the very least did not produce during discovery, accurate inventory and sales records for the specific works rented and sold from the three Daewoo video stores.  The plaintiffs' evidence establishes that from March 2008 through June 2009, the Daewoo stores sold 239,450 units of video programming, resulting in net sales revenues of $225,567.88.  See Pls.' Trial Exs. 151 and 164 (records and compilations of monthly video sales by Ro and Daewoo).  However, without adequate inventory records, it is impossible to estimate the specific percentage of works sold by Daewoo during the relevant time period that were infringing copies of the plaintiffs' works, as opposed to other Korean, Japanese, or Chinese-language video programming.

15.   On April 7, 2011, the Honorable Ivan D. Davis, United States Magistrate Judge, accordingly entered an Order granting in part plaintiffs' Motion for Sanctions for Spoliation of Evidence,

finding that defendants Ro and Daewoo had "failed to keep records of inventory as well as sales and rentals of Plaintiffs' works after receiving reasonable notice" of possible legal actions for copyright infringement.  See Dkt. No. 205 (April 7, 2011 Order).  Judge Davis recommended several sanctions for such conduct, including an adverse inference that "*at least* twenty percent (20%) of the total number of Plaintiffs' works distributed by the defendants between August 2008 and June 2009 were infringing works."  Id. (emphasis added).

Defendants Ro and Daewoo filed objections pursuant to Fed. R. Civ. P. 72 to Judge Davis's April 7, 2011 Order, see Dkt. No. 212, but this Court denied those objections by an Order issued on June 20, 2011, see Dkt. No. 233.  The Court therefore affirmed the adverse inference that *at least* 20% of the Daewoo defendants' 2008-2009 sales were infringing.  That percentage is based on the fact that forensic examination of the 8,105 DVDs produced during discovery revealed that 1,574 (or approximately 19.4%) of them were pirated copies of the plaintiffs' registered works.  See Dkt. No. 213 (Stipulation[s] of Fact of the Parties) ¶ 3.

In fact, it is possible that the percentage is as high as 60%, because of the 162 DVDs that plaintiffs' private investigator purchased from the Daewoo stores, 98 (or approximately 60.5%) of them were infringing copies.  See id. ¶¶ 2-3.  Moreover, several Daewoo employees testified during their depositions that the majority of the Daewoo defendants' customers were Korean, thereby implying that the majority of Daewoo's inventory consisted of

Korean-language broadcasting.  <u>See</u> Dkt. No. 203 (Pls.' Reply to Resp. to Mot. for Sanctions for Spoliation of Evid.) at Ex. 1 (Dep. of Soyoon Lee) at 14:6-22; <u>id.</u> at Ex. 2 (Dep. of Yun Sook Ro) at 17:17-18:10.

In total, therefore, the revenues that the Daewoo defendants derived from the unlawful rental and sales of the plaintiffs' works from March 2008 through June 2009 could range from approximately $45,113.00 (20% of $225,567.88) to $135,341.00 (60% of $225,567.88).

16.   The testimony and evidence adduced during the bench trial also clearly establishes that defendants Ro and Daewoo willfully violated the plaintiffs' copyrights, such that they are exposed to the heightened statutory damages set forth in 17 U.S.C. § 504(c)(2).

First, Ro is no stranger to United States copyright laws, as he has previously been found both criminally and civilly liable for copyright infringement, for essentially the exact same conduct as in the instant case.  <u>See</u> <u>United States v. Ro</u>, No. 1:94cr164 (E.D. Va. 1994) (Brinkema, J.) (imposing a 2 year probationary sentence on Ro after entry of a guilty plea to criminal copyright charges); <u>Dae Han Video Prod., Inc. v. Chun, et al.</u>, No. 89-1470-A, 1990 WL 265976, 17 U.S.P.Q.2d 1306 (E.D. Va. June 18, 1990) (Cacheris, J.) (finding Ro and his former business, Koritech, civilly liable for copyright infringement, and imposing monetary damages in the amount of $307,500.00).

Second, all of the plaintiffs sent Ro cease and desist letters as early as July 2008, informing him that they were aware that he was committing copyright infringement and demanding that he cease his illegal activities or face the initiation of legal proceedings against him.  See, e.g., Pls.' Trial Ex. 1 (KBSA cease and desist letters); see also id. at Exs. 171-73 (SBSI cease and desist letters and associated FedEx tracking and delivery information).  Those letters were addressed and delivered to the Daewoo stores, and one letter even appears to have been signed for by defendant Ro himself.  See id. at Ex. 172 (July 23, 2008 cease and desist letter, with an associated FedEx tracking label showing a signature from "Y. Ro"); see also Dkt. No. 203 (Pls.' Reply to Resp. to Mot. for Sanctions for Spoliation of Evid.) at Ex. 1 (Dep. of Soyoon Lee) at 22:5-15 (testimony of a Daewoo video employee that the Daewoo employees never opened any mail addressed to the Daewoo stores, and instead left it for Ro to open).

Finally, uncontroverted trial testimony from several of the plaintiffs' employees (SBSI's Hyunseung ("Sam") Lee, KBSA's Seo Hee Han, and MBC's Josephine Choi), establishes that Ro had personal conversations with representatives of each of the plaintiffs in which he was explicitly warned not to infringe the plaintiffs' copyrights.  During those conversations, Ro admitted that he knew what he was doing was wrong, but he stated that he had to engage in illegal copying because his business was experiencing financial difficulties.  See also Dkt. No. 197 (Pls.' Reply to Resp. of

12

[Defs.] to Pls.' Mot. for Partial Summ. J.) at Ex. 5 (Dec. 4, 2009 Dep. of Ro) at 15:6-19 (offering the excuse that copyright infringement might somehow be permissible if the "video business is losing money," the "store is suffering because of the losing money instead of making profit," and "the store owner is in the . . . unavoidable financial situation"). In fact, in several of those conversations, Ro even threatened plaintiffs' representatives, attempting to use his unlawful activities as a bargaining chip by telling the plaintiffs that if they did not reduce their weekly license fees to an amount that he considered reasonable, he would simply rent or sell their videos illegally. Under these circumstances, Ro was obviously fully aware that what he was doing was unlawful, and his deliberate and systematic infringement of the plaintiffs' copyrights was the very definition of willful.[3]

## II.  REMEDIES

The Copyright Act provides the owner of a copyright with a "potent arsenal of remedies against an infringer of his work." <u>Sony Corp v. Universal City Studios</u>, 464 U.S. 417, 433 (1983).  Included among the possible remedies are:

---

[3]     Notably, plaintiffs' IP technology expert, Holland, testified that the "WINAVI" DVDs in the Daewoo defendants' possession must have been downloaded from websites and/or captured from HD broadcasts, which is a "significant undertaking" that can take at least an hour per DVD.  Moreover, no effort was made to hide the obvious markings that showed that the DVDs were infringing copies of the plaintiffs' protected works.  Ro's blatant, organized, and sustained piracy efforts therefore also contribute to the Court's finding of willfullness.

an injunction to restrain the infringer from violating his rights, the impoundment and destruction of all reproductions of his work made in violation of his rights, a recovery of his actual damages and any additional profits realized by the infringer or a recovery of statutory damages, and attorneys' fees.

Id. at 433-44; see also 17 U.S.C. §§ 502-505. In this case, plaintiffs seek "an injunction against further infringements by the Defendants and all applicable monetary damages, including statutory damages under 17 U.S.C. § 504, as well as costs and attorneys' fees." See Dkt. No. 229 (Pls.' Trial Mem.) at 2; see also id. at 3. The Court will evaluate each request in turn.

### A. Permanent Injunction

In copyright actions, courts traditionally grant permanent injunctions if liability is established and there is a continuing threat to the copyright. See Dae Han Video, 1990 WL 265976, at *1311; see also Nat'l Football League v. McBee & Bruno's, Inc., 792 F.2d 726, 732 (8th Cir. 1986); Pac. & S. Co., Inc. v. Duncan, 744 F.2d 1490, 1499 (11th Cir. 1984).

In the present case, a permanent injunction must issue against these defendants to eliminate the threat of future infringements. Plaintiffs have demonstrated that the Daewoo defendants, with the assistance of Korean Korner and Yoo, infringed the plaintiffs' copyrights continuously over a sustained period of time, lasting over a year in total. Moreover, with the exception of Yoo, each of the defendants in this civil action has a history of having previously engaged in the unlawful copying and selling of Korean

14

video programming, in violation of United States copyright laws.
See Dae Han Video, 1990 WL 265976 (finding Ro and Daewoo civilly
liable for copyright infringement); Dae Han Video Prods., Inc. v.
Kuk Dong Oriental Food, Inc., 1990 WL 284748, 19 U.S.P.Q.2d 1294 (D.
Md. Dec. 11, 1990) (finding Korean Korner liable for copyright
infringement).

In light of that history, and given the ease with which copies
of the Korean television programs belonging to the plaintiffs can
apparently be made, a sufficiently strong likelihood of future
infringement exists to warrant the imposition of a permanent
injunction pursuant to 17 U.S.C. § 502(a).  Id.  Accordingly,
defendants will be permanently enjoined, absent proper
authorization, from copying, renting, or selling plaintiffs' video
programming or assisting others to copy, rent, or sell plaintiffs'
video programming.

**B. Monetary Damages**

### 1.  Defendants Ro and Daewoo

Under the provisions of 17 U.S.C. § 504, a copyright owner is
entitled to recover either one of two forms of damages: (i) the
owner's actual damages, plus any additional profits of the
infringer; or (ii) statutory damages.  See 17 U.S.C. § 504(a); see
also id. § 504(c) (providing that when a court has found a defendant
liable for copyright infringement, the "copyright owner may elect  .
. . to recover, instead of actual damages and profits, an award of
statutory damages for all infringements involved in the action").

15

For non-willful infringement, the Court may impose statutory damages of not less than $750 and not more than $30,000 per act of infringement.  Id. § 504(c)(1).  If, however, the Court finds that the infringement was willful, then the damages imposed may be increased up to $150,000 per act of infringement.  See id. § 504(c)(2).  Within these outer limits, "the court's discretion and sense of justice are controlling."  L.A. Westermann Co. v. Dispatch Printing Co., 249 U.S. 100, 106 (1919); see also F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 231-32 (1952).

The Copyright Act does not specifically define "willfulness," but courts generally find willfulness where the defendants either knew, had reason to know, or recklessly disregarded the fact that their conduct constituted copyright infringement.  See Lyons P'ship, L.P. v. Software & Morris Costumes, Inc., 243 F.3d 789, 799-800 (4th Cir. 2001); Superior Form Builders v. Dan Chase Taxidermy Supply Co., 74 F.3d 488, 498 (4th Cir. 1996).  Willfulness may be inferred where there is evidence that infringements continued after warnings or cease and desist letters from the plaintiff.  See Masterfile Corp. v. Dev. Partners, Inc., No. 1:10cv134, 2010 U.S. Dist. LEXIS 100857, 14-15 (E.D. Va. Aug. 16, 2010) (Davis, J., adopted by Trenga, J.); Graduate Mgmt. Admission Council v. Lei Shi, No. 1:07cv605, 2008 U.S. Dist. LEXIS 1621, 5-6 (E.D. Va. Jan. 7, 2008) (Brinkema, J.); see also Melville B. Nimmer & David Nimmer, Nimmer on Copyright (hereinafter "Nimmer"), § 14.04(B)(3)(a) (1991) (stating that willfulness "classically arises when [the] defendant

ignores a warning letter sent by plaintiff's counsel"). Moreover, the Fourth Circuit has held that statutory damages should be increased on a finding of willfulness where there is evidence that the defendants have knowledge of the copyright laws, have a history of copyright infringement, or are "apparently impervious to either deterrence or rehabilitation." Superior Form Builders, 74 F.3d at 496-97.

Here, plaintiffs have elected to receive statutory damages for the 37 statutory infringements for which this Court already found defendants Ro and Daewoo liable. See Dkt. No. 229 (Pls.' Trial Mem.) at 11. The Court will therefore proceed to determine the appropriate amount of statutory damages to award, mindful of the fact that an award of statutory damages is meant to encompass both compensation for the plaintiffs and deterrence of the defendants. See F.W. Woolworth, 344 U.S. at 234; Graduate Mgmt. Admission Council v. Raju, 267 F. Supp. 2d 505, 512 (E.D. Va. 2003) (Ellis, J.); Music City Music v. Alpha Foods, Ltd., 616 F. Supp. 1001, 1003 (E.D. Va. 1985) (Warriner, J.).

As a threshold matter, and as noted above, the Court finds that defendants Ro and Daewoo's infringement of plaintiffs' copyrights was unquestionably willful. See supra at 11-13 (Findings of Fact ¶ 16). Ro has an extensive history of copyright infringement, and his own words reveal that he was fully aware that his conduct in this case was unlawful. In fact, according to testimony from plaintiffs' representatives, Ro even had the audacity to explicitly

17

threaten plaintiffs during licensing fee negotiations that he would "operate his business illegally" by making and selling unauthorized copies of the plaintiffs' works if the plaintiffs did not reduce their fees.  He also continued to infringe the plaintiffs' copyrights for almost a full year after receiving the first cease and desist letter in July 2008, and he did not discontinue his infringing activity even after several face-to-face conversations with plaintiffs' employees, who warned him directly that his conduct was illegal and could expose him to civil liability.  Under these circumstances, there is overwhelming evidence of willfulness, and defendants Ro and Daewoo are therefore exposed to a statutory damages range of $750 to $150,000 per act of infringement.  See 17 U.S.C. § 504(c)(2).

The Court must now determine where in that permitted statutory range the damages should fall.  In making such assessments, courts generally begin by considering the underlying economic realities of the situation, including the actual damages suffered by the plaintiff, any expenses saved by the defendants in avoiding a licensing arrangement, and any profits reaped by the defendants in connection with the infringements.  See, e.g., Olde Mill Co., Inc. v. Alamo Flag, Inc., No. 1:10cv130, 2010 U.S. Dist. LEXIS 97179 (E.D. Va. Aug. 27, 2010) (Jones, J., adopted by Brinkema, J.); EMI April Music, Inc. v. White, 618 F. Supp. 2d 497, 508-09 (E.D. Va. 2009) (Davis, J.); see also Nimmer, § 14.04 [B] at 14-41.  After all, "[w]hen awarded, statutory damages should bear some relation to

the actual damages suffered." <u>Dae Han Video</u>, 1990 WL 265976, at *7 (citing <u>Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.</u>, 670 F. Supp. 1133, 1140 (E.D.N.Y. 1987)).

Unfortunately, the actual damages and profits in this case are somewhat difficult to determine, largely because the Daewoo stores did not maintain even basic records of the specific DVDs in their inventories. At a minimum, plaintiffs are entitled to the full licensing fees that the Daewoo stores should have paid for their use of the plaintiffs' proprietary video programming during the relevant time period of March 2008 through June 2009. By agreement of the parties, those licensing fees have been calculated to total $154,895.00. <u>See</u> Dkt. No. 231 (Stipulation[s] of Fact of the Parties) ¶¶ 16-18. Furthermore, any statutory damages award should also encompass disgorgement of the profits that Ro and Daewoo derived from their unlawful rental and sales of unauthorized copies of the plaintiffs' works. As explained above, those exact profits are nearly impossible to calculate, but they likely range somewhere from approximately $45,000.00 to $135,000.00, and could even be as high as approximately $225,500.00. <u>See</u> <u>supra</u> at 9-10 (Findings of Fact ¶¶ 14-15).

The actual damages, however, merely serve as a floor for any statutory damages recovery, and the Court must also consider such factors as effective deterrence. <u>See</u> <u>F.W. Woolworth</u>, 344 U.S. at 234 ("[A] rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It

would fall short of an effective sanction for enforcement of the copyright policy."). Here, the Court finds it notable that a previous civil damages award of $307,500.00, see Dae Han Video, 1990 WL 265976, at *6, apparently made no impression whatsoever on Ro, nor did a two-year criminal probationary sentence, including 60 days of home confinement, 200 hours of community service, and a $1,000.00 fine, see United States v. Ro, 1:94cr164, at Dkt. No. 9 (criminal judgment against Ro). Ro therefore qualifies as a defendant who is "apparently impervious to either deterrence or rehabilitation." Superior Form Builders, 74 F.3d at 496, and that fact alone justifies a heightened damages award of significantly more than $307,500.00, in the hopes that this time, Ro might finally get the message.

Ultimately, based on all of the evidence, the Court concludes that an award of $15,000 per statutory infringement against the Daewoo defendants is reasonable and appropriate given the willful and repeated nature of the defendants' violations. When multiplied by the 37 statutory infringements that the Court previously found, the total award against defendants Daewoo and Ro, jointly and severally, is $555,000.00.[4]

---

[4] Because this statutory damages award more than subsumes the total licensing fees that should have been paid by the Daewoo defendants, along with all estimated profits that should be disgorged from Daewoo and Ro, the Court will not award any non-statutory damages that the plaintiffs otherwise requested for the 62 non-statutory infringements previously found by this Court. See Dkt. No. 229 (Pls.' Trial Mem.) at 3 (requesting "actual damages for the 62 non-statutory infringements found by this

## 2. Defendants Yoo and Korean Korner

Plaintiffs have also requested that defendants Yoo and Korean Korner be held jointly and severally liable for any statutory damages award imposed against the Daewoo defendants. See Dkt. No. 229 (Pls.' Trial Mem.) at 3. However, plaintiffs did not prove willfulness against Yoo or Korean Korner at trial, nor did they establish that Yoo and Korean Korner are in any way as culpable as are Ro and Daewoo.

To be sure, Yoo and Korean Korner admitted that they sold DVDs of the plaintiffs' works to the Daewoo defendants, thereby materially contributing to copyright infringement. Those sales were in direct violation of the terms of the defendants' oral licensing agreements with the plaintiffs. See, e.g., Pls.' Trial Ex. 196 (sample MBC written contract, which was sent to Ro but never signed and returned, and which MBC's representative, Josephine Choi, testified was consistent with the oral licensing terms with Daewoo, stating that the licensee is only authorized to make copies of authorized "master" programming and "to rent [not sell] such videotape and/or DVD copies to LICENSEE's walk-in customers") (emphasis added). Moreover, under the circumstances, Yoo and Korean Korner must have known, or at the very least were willfully blind to

_____

Court, in the amount of the total license fees that should have been paid by each of the defendants during the relevant time periods and the disgorgement of all profits for each of the defendants, *to the extent that such non-statutory damages are not subsumed within any award of statutory damages*") (emphasis added); see also 17 U.S.C. § 504(c).

the possibility, that Ro and Daewoo were infringing the plaintiffs' copyrights by making unauthorized sales of the plaintiffs' proprietary video programming.  As such, they are liable for contributory copyright infringement.  See A&M Records v. Napster, Inc., 239 F.3d 1004, 1020-23 (9th Cir. 2001) (holding that turning a blind eye to detectable acts of infringement for the sake of making a profit can give rise to liability for contributory copyright infringement); see also Harvester, Inc. v. Rule Joy Trammell & Rubio, LLC, 716 F. Supp. 2d 428, 445 n.15 (E.D. Va. 2010) (Hudson, J.) (explaining that a party "who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another" can be held contributorily liable for copyright infringement).

On the other hand, plaintiffs themselves are partly to blame for any confusion regarding what was or was not permissible under the terms of their licensing arrangements with Yoo and Korean Korner because they never reduced any of their agreements with those defendants to writing.  Furthermore, the plaintiffs' own evidence establishes that Yoo and Korean Korner cannot be held jointly and severally liable for the 37 statutory infringements in this case. Specifically, each and every one of those statutory infringements involved a DVD with a "WINAVI" volume identifier, see Pls.' Trial Ex. 168, meaning that those DVDs were not direct copies of the plaintiffs' masters, but instead had been downloaded or captured from unauthorized sources, such as online video pirating websites.

However, no evidence was presented at trial to suggest that Yoo or Korean Korner had ever engaged in such downloading or capturing of pirated video. Rather, the only evidence in the record merely establishes that Yoo and Korean Korner each sold copies of the master DVDs that they received from the plaintiffs - which, by definition, would not have carried a "WINAVI" volume identifier - to the Daewoo defendants. Accordingly, defendants Yoo and Korean Korner cannot be found jointly and severally liable for the full statutory damages award imposed against Ro and Daewoo.

Instead, the Court finds that a significantly lesser damages award against Yoo and Korean Korner is appropriate in this case. With respect to Yoo, who does not have any history of copyright infringement and who appeared to testify truthfully at trial, the Court will simply order the disgorgement of all profits that she received from her unauthorized sales of KBSA and SBSI DVDs to the Daewoo defendants. See Pls.' Trial Ex. 165 (compilation of monthly sales data, showing $3,309.00 in total revenue for Yoo's sales of SBSI programming to Daewoo, and $13,642.00 in total revenue for her sales of KBSA programming).[5]  The total judgment awarded against Yoo

---

[5]  In her Trial Memorandum, Yoo argued that the Court should find gross revenues only in the amount of $16,753.00, and should assume a profit margin of 20%, such that the only profits that should be disgorged would be $3,350.00. See Dkt. No. 227 (Trial Mem. re: Damages for Defs. Korean Korner and Yoo) at 2. However, Yoo did not submit any evidence of her profit margins during the bench trial, nor did she introduce evidence to contradict plaintiffs' sales and revenue figures. The Court will therefore impose judgment against Yoo in the full amount of $16,951.00.

will therefore be $16,951.00, to be imposed jointly and severally with the Daewoo defendants.

With respect to Korean Korner, the Court finds a slightly higher level of culpability on its part than on the part of Yoo. Korean Korner has a documented history of engaging in copyright infringement, see Dae Han Video, 1990 WL 284748, and its conduct in this case is all the more troubling in light of that checkered past. Korean Korner's owner and corporate designee, Young Nam ("Nam"), also admitted during his deposition that he sold DVDs of MBC works to Ro and Daewoo without ever inquiring whether Ro and Daewoo were authorized to rent or sell those works, and that he was fully aware that if Ro and Daewoo were not paying the required weekly licensing fees to MBC, then such conduct would be unlawful:

> Q: When Mr. Ro came to Korean Korner in 2008 for the purpose of purchasing MBC video content, did you know what he was going to do with that video content?
>
> . . .
>
> A.  Yes. . . . I was understanding he's going renting – for rent for his customers.  I understood that way.
>
> Q: And you had no problem selling him MBC content for the purpose of him renting to his customers?
>
> . . .
>
> A: He needed the DVDs and wanted to buy from me, so I sold him.
>
> . . .
>
> Q: Was it your understanding that Mr. Ro was paying a fee to MBC at that time?

24

A: At that time, no, I didn't know, and I didn't ask and he didn't tell me.

Q: If he had not been paying a fee to MBC at that time, would you still have sold him MBC content for his purpose of renting and selling to the public?

A: He's not paying for the royalty and supposed not to carry the items from MBC.

Pls.' Trial Ex. 157 (Dec. 2, 2009 Dep. of Nam) at 58:15-61:5; see also id. at Ex. 156 (Aug. 24, 2009 Dep. of Nam) at 35:15-21 ("Q: Were you aware when Korean Korner, Inc. was selling to Mr. Ro copies of the master DVDs that he would go out and rent or sell in his stores copies of the copies he had purchased from you?  A: If he copies my copy, it's not right, I think.").

Moreover, having observed Nam's demeanor on the stand, the Court finds that many aspects of his trial testimony, from his claim that he was unaware whether the Daewoo defendants would copy and sell the MBC works that he provided to them, to his assertions that he could not recall the material terms of his oral licensing agreements with the plaintiffs and had never seen the copyright warnings affixed to the plaintiffs' videos, simply were not credible.  Indeed, Nam's professed inability to remember even basic details of his years-long business relationship with the plaintiffs casts serious doubt on the accuracy of any of his testimony. Finally, Nam's bold assertion during his deposition that he "did not care" about the copyright warnings in the plaintiffs' videos bespeaks a level of nonchalance towards the United States copyright system that this Court finds deeply problematic.  See id. Ex. 156

25

(Aug. 24, 2009 Dep. of Nam) at 52:15-21 (testifying, in response to questioning about a screenshot of copyright warnings that appear at the beginning of the plaintiffs' videos: "A: But that doesn't mean that much to me. It's not contract. They just advertise or they just put on this paper there that walk-in customer - What is that? I don't know. I don't care about that. Q: You don't care? A: I don't care about that.").

Ultimately, therefore, for all these reasons, the Court finds that an appropriate monetary judgment against Korean Korner is $21,700.00. That judgment includes the disgorgement of the $7,000.00 in profits that Korean Korner derived from its sales of MBC works to the Daewoo defendants. See Pls.' Trial Ex. 165. It also includes joint and several liability with the Daewoo defendants for a portion of the $29,400.00 in licensing fees that the defendants have stipulated that Daewoo should have paid to MBC during the relevant time period. See Dkt. No. 231 (Stipulation[s] of Fact of the Parties) ¶ 18. Specifically, because Ro apparently obtained MBC works in two different ways - first, by downloading or capturing them from the Internet, and second, by purchasing them from Nam and Korean Korner - the Court will hold Korean Korner responsible for exactly half of the licensing fees that should have been paid to MBC, or $14,700.00. In total, therefore, the monetary judgment against Korean Korner is $21,700.00, to be imposed jointly and severally against Korean Korner and the Daewoo defendants.

## C.  Attorneys' Fees and Costs

Plaintiffs are also entitled to recover their reasonable attorneys' fees and costs incurred in pursuing this civil action, and they have submitted a Motion for Attorneys' Fees and Costs in which they seek a total award of $1,022,009.88.  See Dkt. No. 236. Defendants have filed oppositions to that motion, which include, inter alia, references to the history of settlement efforts in this case.  See Dkt. Nos. 237 and 239.

In evaluating the reasonableness of any attorneys' fees award against the backdrop of the settlement negotiations between the parties, the Court finds that it would be useful to review the offers of judgment that were tendered by the defendants pursuant to Fed. R. Civ. P. 68.  See Dkt. Nos. 223-226.  Although at least one such Rule 68 offer was initially filed publicly via the Court's electronic filing system, see Dkt. No. 223, that offer was quickly removed from the public docket after the erroneous public filing. Accordingly, the Court has not yet seen any of the defendants' offers of judgment, all of which have been docketed under seal, with the originals placed in the civil vault.

To evaluate the reasonableness of the plaintiffs' attorneys' fees request, the Court needs to know how close the defendants' various offers of judgment were to the damages that the Court has awarded.  At the same time, the Court wishes to avoid any appearance of the damages calculations in this matter having been influenced in any way by the defendants' offers of judgment.  For those reasons,

27

the plaintiffs' Motion for Attorneys' Fees and Costs will be addressed in a separate opinion, to be issued after the Court reviews the offers of judgment.

### IV.   Conclusion

For the reasons stated above, and by an Order to be issued with this Memorandum Opinion, all of the defendants will be permanently enjoined, absent proper authorization, from copying, renting, or selling plaintiffs' video programming or assisting others to copy, rent, or sell plaintiffs' video programming.  Furthermore, monetary judgments will be entered against the defendants in the following amounts: against defendants Daewoo and Ro, jointly and severally, in the amount of $555,000.00; against defendant Yoo in the amount of $16,951.00, jointly and severally with defendants Daewoo and Ro; and against defendant Korean Korner in the amount of $21,700.00, jointly and severally with defendants Daewoo and Ro.  The reasonableness of the plaintiffs' requested attorneys' fees and costs will be determined in a forthcoming opinion, and the Clerk will therefore be directed not to enter final judgment pursuant to Fed. R. Civ. P. 58 until the Court has had an opportunity to rule on plaintiffs' pending Motion for Attorneys' Fees and Costs.

Entered this _26_ day of July, 2011.


Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge